IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| CHRISTOPHER EMERSON, CHRISTOPHER B. CRANE-EMERSON BY HIS FATHER AND NEXT FRIEND, CHRISTOPHER EMERSON, AND GABRIELLA CRANE-EMERSON BY HER FATHER AND NEXT FRIEND, CHRISTOPHER EMERSON, | ) ) ) ) ) ) ) ) ) |
| Plaintiffs | ) ) ) ) ) |
| vs. | )   No. ) _ |
| FMH HEALTH SERVICES, LLC D/B/S FRISBIE MEMORIAL HOSPITAL | ) ) ) |
| Defendant | ) ) ) |

**PLAINTIFF'S ORIGINAL COMPLAINT**

Christopher Emerson and his children, Christopher B. Crane-Emerson and Gabriella Crane-Emerson, by and through their undersigned counsel, Red Sneaker Law, PLLC, as and for their respective claims against FMH Health Services, LLC (Frisbie) hereby allege:

**PRELIMINARY STATEMENT**

1.  This is a civil rights lawsuit brought, primarily, under the Americans with Disabilities Amended Act in order to end at least a decade of documented, ongoing discrimination by a major seacoast hospital that despite its promise to provide "the best possible care," has failed, time and again, even after a settlement with the United States Department of Justice, to provide equal communication access to Deaf and Hard-of-Hearing patients and their families.

2.   In short, Frisbie, among other things, used an 11 year old child as a sign language interpreter for her Deaf parents as her mother slowly died.  The intent of this lawsuit is to end such callous, insensitive, and illegal behavior.

## JURISDICTION

3.   This Court has Federal Question Jurisdiction pursuant to 28 USC § 1331, as this action is based upon two important federal statutes; the Americans with Disabilities Act, Tittle II, 42 USC § 12131 et. seq. and Title III, 42 USC § 12181 et. seq. and the Rehabilitation Act, 29 USC § 794, Section 504.

4.   The Plaintiff requests that this Court exercise supplemental jurisdiction over the State court causes of action named herein as they arise from the common nucleus of operative facts.  28 USC § 1367.

## VENUE

5.   Venue is proper in the United States District Court for the District of New Hampshire pursuant to 28 USC § 1391(b) and (c) as the Defendant's medical facility is based in New Hampshire, Plaintiffs were, at all relevant times, and are currently, New Hampshire residents and the core nucleus of operative facts occurred within this venue.

## JURY TRIAL DEMANDED

6.   Plaintiffs demand a trial by jury on each of the causes of action.

## PARTIES

7.   Defendant FMH Health Services, LLC is a Foreign Limited Liability Company with a principal business address of One Park Plaza, Nashville, Tennessee, 37203 which operates the trade name Frisbie Memorial Hospital at 11 Whitehall Road, Rochester, County of Strafford, State of New Hampshire.  Frisbie Memorial Hospital is a "public accommodation" as defined in 42 U.S.C. § 1281(7)(F) and its implementing regulation, 28 C.F.R. § 36.104 because it is a private entity that operates a place of public accommodation, specifically, a hospital.

8.   Plaintiff Christopher Emerson, the father of Christopher B. Crane-Emerson and Gabriella Crane-Emerson and widower of Glenys Crane-Emerson, is profoundly, prelingually deaf and resided, at all material times, at 96 Salmon Falls Road, Rochester, NH 03868.  Mr. Emerson is an individual with a disability within the meaning of ADA 42 U.S.C. § 12102(1) and its implementing regulation at 29 C.F.R. Part 36 as Mr. Emerson is prelingually Deaf and communicates, primarily, through his first language, American Sign Language (ASL).

9.   Plaintiff Christopher B. Crane-Emerson is the minor child of Plaintiff Christopher Emerson and is, then, a Child of Deaf Adult (CODA).   At all material times, Christopher B. Crane-Emerson resided with his father.

10. Plaintiff Gabriella Crane-Emerson is the minor child of Plaintiff Christopher Emerson and is, then, a Child of Deaf Adult (CODA).  At all material times, Gabriella Crane-Emerson resided with her father.

## FACTS

### FACTS ABOUT FRISBIE'S PREVIOUS SETTLEMENT AND KNOWLEDGE OF ITS DUTY

11.     Frisbie Memorial Hospital (Frisbie) is an acute care facility with a long history of failures in providing communication access to deaf and hard-of-hearing patients and their families. The documentation of these failures began more than a decade ago with another lawsuit and another deaf patient denied communication access.  And another example of Frisbie using a companion as an interpreter instead of using a trained and qualified ASL interpreter.

12.     In 2010, the United States Department of Justice determined that, in 2005, Frisbie violated the rights of two individuals, one deaf and the other hard-of-hearing and entered into a settlement agreement with Frisbie to resolve the claims.

13.     While the names of those complainants is redacted from the public record, it is clear that, as far back as July 2005, Frisbie failed to provide sign language interpreters for a deaf patient

who communicated via ASL, failed to provide any other adequate or appropriate auxiliary aid and even used that deaf patient's hard-of-hearing companion as an interpreter.

14.     While the claims were disputed, Frisbie and the Department of Justice entered into a settlement agreement which required Frisbie to establish a program to ensure it would provide effective communication to deaf and hard-of-hearing patients in the future.  Whatever changes Frisbie may have implemented, Frisbie failed to continue them.

15.     In Agreement D.J. No. 202-47-52, Frisbie agreed, among other things to:

a. Appoint two or more Program Administrators, to be available 24/7, to answer questions and provide appropriate assistance regarding immediate access to and the proper use of appropriate auxiliary aids and services required by the settlement agreement;

b. Make a determination of the need for an auxiliary aid at the time the patient initially comes into contact with hospital personnel;

c. That determination is to be documented using a form that takes into account:

   i. The nature, length and importance of the communication at issue;

   ii. The individual's communication skills and knowledge;

   iii. The Patient's health status or changes thereto;

   iv. The Patient's and/or Companion's request for or statement of the need for an interpreter or other specific auxiliary aid or service;

   v. The reasonably foreseeable health care activities of the Patient; and

   vi. The availability at the required times, day or night, of the Appropriate Auxiliary Aids and Services.

d. Any denial or determination that an Auxiliary Aid or Service will be provided is to be documented along with its basis;

e. Provide qualified sign language interpreters to Patients and Companions whose primary means of communication is sign language, and qualified oral interpreters to such Patients

and Companions who rely primarily on lip reading, as necessary for effective communication. The following are non-exhaustive examples of circumstances when it may be necessary to provide interpreters:

i.   determination of a Patient's medical history or description of ailment or injury;

ii.   provision of Patients' rights, informed consent or permission for treatment;

iii.   determination and explanation of Patient's diagnosis or prognosis, and current condition;

iv.   explanation of procedures, tests, treatment, treatment options or surgery;

v.   religious services and spiritual counseling provided by the Hospital;

vi.   explanation of living wills or powers of attorney (or their availability);

vii.   diagnosis or prognosis of ailments or injuries;

viii.   explanation of medications prescribed (such as dosage, instructions for how and when the medication is to be taken, and side effects or food or drug interactions);

ix.   determination of any condition or allergy of Patient that may affect choice of medication;

x.   explanation regarding follow-up treatments, therapies, test results or recovery;

xi.   blood donations or apheresis (removal of blood components);

xii.   discharge planning and discharge instructions;

xiii.   provision of mental health evaluations, group or individual therapy, counseling and other therapeutic activities, including, but not limited to, grief counseling and crisis intervention;

xiv.   explanation of complex billing or insurance issues that may arise;

      xv.  educational presentations, such as classes concerning birthing, nutrition, CPR, and weight management;

      xvi.  filing of administrative complaints or grievances against the Hospital or Hospital Personnel; and

      xvii.  any other circumstance in which a qualified sign language interpreter is necessary to ensure a Patient's rights provided by law.

    f.    Make no fewer than 5 attempts, starting within 15 minutes of determining the need, to locate an interpreter and provide one within 1 hour at least 80% of the time;

16.    Frisbie, given the extent of this Settlement Agreement with the United States Department of Justice, is well aware of its responsibilities to Deaf patients and their families. And it is well aware it failed the Emerson family during the worst moments of their lives.

17.    Most notably, nothing in this Agreement with the government suggests it is appropriate to use an eleven year old child as an interpreter.


## FACTS ABOUT COMMUNICATION WITH THE DEAF AND HARD-OF-HEARING

18.    According to the Center for Disease Control, "[a]bout 40% of the sounds in the English language can be seen on the lips of a speaker in good conditions — such as a well-lit room ... But some words can't be read. For example: "bop", "mop", and "pop" look exactly alike when spoken. (You can see this for yourself in a mirror). A good speech reader might be able to see only 4 to 5 words in a 12-word sentence." https://www.cdc.gov/ncbddd/hearingloss/language.html (last visited 7/08/2022).

19.    To put the previous paragraph into context, this is what lipreading 5 of every 12 words of that paragraph might look like spoken to a Deaf person trying to lip read:

According the Control, "[a]bout sounds the English can be on the speaker in good— room ... some can't read. For example: "", "", and "" exactly alike when. (You this for in a mirror). A speech might be to see only 4 to 5 in a 12-word."

20.     It is difficult, in any given situation, to know what words might be lipread and which might not, but, in the above example, for purposes of demonstration, the "important" words were left in the example even though those are, as they are less commonly used and seen in everyday conversation, the words least likely to be understood.  More than that, more than 5 words of each 12-word sequence were left in the example.

21.     Studies by Gallaudet University, The University for the Deaf in Washington D.C., demonstrate the average reading level for an 18-year-old high school graduate, who happens to be deaf, hasn't changed much in the last 50 years, remaining stable between a third and fourth grade level. To put that into context, the average newspaper, online or otherwise, in the United States is written at an 11th grade level. The largest American Sign Language Dictionary holds some 5,600 words, while the Oxford English Dictionary has 500,000.

22.     It is easy to see why it is so important to provide appropriate auxiliary aides, at appropriate points of interaction, to the Deaf and hard-of-hearing; without such aides, equal access is impossible.  It is even more impossible if a hospital elects to use an 11 year old child to interpreter for her Deaf parents rather than simply turn on a Virtual Relay Interpreter device.

## STATEMENT OF FACTS AS TO THIS CASE

### JULY 2019

23. In July of 2019, Frisbie Memorial Hospital put 11 year old Gabriella Crane-Emerson in an untenable position.  As her mother, Glenys, lay on a hospital gurney moaning in pain with blood oozing from her eyes and mouth, stomach distended, mental state altered, and, in essence, dying of liver failure, Gabriella was forced to act as an sign language interpreter despite the ready availability of modern technology.

24. Glenys Emerson-Crane, who was prelingually and profoundly Deaf[1] and thus communicated using American Sign Language, was transported by ambulance and admitted to Frisbie Memorial Hospital on 7/20/2019 as her mental state had become altered and she was oozing blood from her eyes and mouth.  Glenys had a long, medical history of multiple sclerosis, hepatitis, as well as alcoholism and was suffering acute liver failure and so, accompanied by her husband, Christopher Emerson, and their two young children she was rushed to the closest hospital, the Defendant, as these additional symptoms flared.

25. Because Glenys was transported by ambulance and had been treated at Frisbie in the past, the Defendant was well aware both she and her husband, Christopher, were Deaf and communicated using American Sign Language (ASL) even before she arrived. To be clear, Frisbie's documentation makes clear they were aware Glenys and her husband were "deaf and primary language is sign."

26. In addition to the advance knowledge of the need for ASL interpreters, when the Emersons arrived at Frisbie at 5:20 pm, the record indicates that EMT's again "advised of the need for an interpreter."

27. Despite that advanced knowledge, Frisbie did not attempt to locate an ASL interpreter until long after the Emersons arrived and made no effort to make use of the Virtual Relay Interpreting Service  (VRI) "Deaf Talk" that the hospital had on site.

28. Upon arrival, and repeatedly throughout their stay, Christopher Emerson requested an American Sign Language (ASL) interpreter for himself and his wife.  Instead, however, Gabriella overheard Frisbie personnel say, "maybe the daughter can interpret."

29. And so, that's what Frisbie did, doctors began their assessment of Mrs. Emerson using 11 year old Gabriella and 14 year old Christopher B. to interpreter over Mr. Emerson's protests.

---

[1] The word Deaf is capitalized on occasion throughout this Complaint to indicate not only the common understanding of deafness as a hearing deficient but also as a cultural identifier.  In other words, one may be deaf, meaning unable to hear, without being Deaf, meaning a member of the larger Deaf community and culture that shares a common language, ASL, which is as separate and distinct as any other culture.  The Emersons were not only deaf but also Deaf.

30. The medical records contain statements such as "Daughter states patient was a 'heavy drinker,…" and "Patient's daughter states 'she was going to go to the doctor tomorrow but she has been sleeping all day today and then we found blood in her mouth.'"

31. At no time did Frisbie offer Mr. Emerson Video Relay Interpreting.  Instead the records say, "Discussed case with patient and family.  Some limitation due to the fact that patient is deaf as well as the husband, ER staff and family have been translating."  The only family with Mr. Emerson were his two young children and nothing in the record indicates that any member of the ER staff was licensed interpreter.

32. The first call for an interpreter was not made until 5:58 pm, 38 minutes after the Emersons arrived at Frisbie.  And that request was made to an emergency service "800 number" provided to Frisbie personnel by Mr. Emerson.  Frisbie personnel began calls to their own list of interpretation providers at 6:04 pm and made their last attempt at 6:33 pm.  The records indicate no further attempts to provide an interpreter or other auxiliary aide were made after this point.

33. After several hours, becoming frustrated at the lack of an interpreter and the use of his daughter to interpret during such a traumatic experience, Mr. Emerson made a request for an interpreter on his Facebook page.

34. The post received an almost immediate response and a qualified, licensed ASL interpreter arrived at Frisbie within an hour at approximately 8pm.  Of note, that interpreter was listed with one of the agencies Frisbie proports to have contacted.

35. In the time between their arrival and Mr. Emerson procuring an interpreter, Mrs. Emerson, or Mr. Emerson on her behalf, could not consent to treatment.  The "Consent To Medical Care and Treatment" form we think of as pro forma during patient registration is signed this way, "nurses would not allow us to ask for signatures / ASL interpreter no longer available" by Frisbie personnel.

36. The record contains further admissions that the Defendant relied upon Mr. Emerson, who is himself prelingually and profoundly Deaf, to interpreter for his wife as it contains statements like, "Her husband is coming in who can sign for her and that will make the interview a little easier."

37. One of Dr. David Olken's, a Frisbie hospitalist, July 21, 2019 notes state, "Husband will be coming into work as translator."  And this was even after Mr. Emerson had provided Frisbie with an interpreter.

38. That same note, made on July 21, 2019, indicates that Frisbie personnel were communicating with Glenys via writing, yet the medical records show that she was visually impaired, with blood oozing from her eyes, and could not read; patient "is unable to read sign on tablet or any remote device secondary to declining vision."

39. While Frisbie did occasionally use the interpreter garnered by Mr. Emerson, the timing of this use was not helpful nor appropriate.  In addition to description above, for example, the medical records show that Defendants' doctors and personnel "extensively reviewed liver function with family and pt; reviewed effects of etoh; reviewed pain management an assessemnet (sic) with pt and family; safety measures maintained; importance of oral care.  Reinforcement Needed Discussion, Demonstration, Teach Back" at times when ASL interpreters were not present.

40. "Informing" the Emersons without the benefit of an interpreter was common during their stay.  After an exam with significant findings involving Glenys vision and the determination of whether to install a central line, the record states, "Husband was updated at the bedside.  Multiple calls have been made to find an interpreter who should be in within the next hour or 2."  There is no record that "Husband" was updated after that interpreter arrived or that he had any understanding of what was explained.

41. Defendant did not perform a standard CIWA (alcohol withdrawal) assessment on Mrs. Emerson because, as the records state, "No interpreter to sign language to obtain accurate ciwa assessment."

42. Even when an interpreter was utilized, it appears they were not effective.  As Nurse Zercher noted, "unalbe (sic) to do \Cam delierum (sic) test; concept of test does not translate well."

43. At approximately 10:00 pm, Glenys was transferred from the ER to the ICU.  The interpreter Mr. Emerson obtained stayed until 11:30pm.

44. Prior to leaving the hospital to put his children to bed, Mr. Emerson asked Frisbie's ICU personnel to arrange for an interpreter for the following day and was told "day shift will handle it."

45. The next morning, at approximately 8:00 am July 21, 2019, Mr. Emerson returned to Frisbie to find that no interpreter was present and again posted on Facebook and again obtained an interpreter who was unable to arrive until afternoon.

46. Again the ICU personnel relied on the Emerson children to interpret.  Even though the records indicate an interpreter would be present at 9:00 am, none arrived until after noon.  Yet another record indicates "sign services notified and will be in for pt and husband at 1230 for one hour" on 7/21/2019.

47. On information and belief, the interpreter expected at 12:30 pm was one obtained by Mr. Emerson's Facebook post.

48. Other than the half hour of attempts the day before, the record is devoid of any attempt to arrange an interpreter for July 21, 2019.  That particular record, from July 20, 2019, shows, in handwritten notes, that Frisbie "used to pay for a program" called EMIS that would guarantee an interpreter within an hour but that the hospital no longer participated.

49. Instead, it appears Frisbie was content to allow an outsourced agency, the Language Bank, attempt to fulfill their legal duty even though Mr. Emerson informed Frisbie personnel that the Language Bank was not his preferred service as they did not provide interpreters whom he and his wife could understand well.

50. On July 21, 2019, Glenys was transferred to Dartmouth hospital where appropriate auxiliary aides were provided for both Emersons and the children were not force to act as interpreters.

**AUGUST 2019**

51. After being transferred to Dartmouth, Mrs. Emerson was sent to Massachusetts General Hospital where her condition worsened to the point of requiring hospice care as she slowly died. And so, Mrs. Emerson found herself in Frisbie again on August 26, 2019 for hospice care so that her family could be close by as she passed.

52. Prior to her admission, Frisbie received a call from Massachusetts General Hospital, where Glenys had been receiving treatment, requesting the transfer.  Frisbie, despite the same  advance knowledge from the July stay along with this call agreeing to an August 26, 2019 admission, did not begin the process of getting an interpreter until August 27, 2019.

53. The record states calls were placed, in an attempt to get a live ASL interpreter, on August 27, 2019 between 10:20 and 10:30am.  The record does not state who was called, how many calls were made, who made the calls or anything else other than only ten minutes of effort were made. And those ten minutes were not spent until Mr. Emerson "requested ASL interpreter to come in for discussion with Hospitalist."  Until that point, it appears Frisbie had no intent of providing Mr. Emerson with any access to communication other than a Deaf Talk (a Virtual Remote Interpreter) system that he did not want and that did not work.

54. The record indicates that Deaf Talk was used with patient/companion consent, yet the consent form for Deaf Talk was not signed and according to a note handwritten by Frisbie personnel, Mr. Emerson refused to sign the form.  Mrs. Emerson, of course, was incapable of consenting at that point.

55. During this August 2019 stay, Frisbie insisted that the Emersons use the hospital's VRI service, Deaf Talk, despite Mr. Emerson's repeated expression of both his need and preference of a live, in person ASL interpreter.

56. The VRI screen would freeze, shut down and generally not provide consistent service, but more so, the screen and camera of the device was positioned in such a way that Mr. Emerson could not use it in either a standing or sitting position.  In order for the onscreen, virtual interpreter and

Mr. Emerson to communicate, Mr. Emerson had to kneel down in front of the screen. Understandably, he "refused" the use of Deaf Talk at that time.

57. When Mr. Emerson insisted on a live interpreter, he was informed by Frisbie personnel that a live interpreter, per hospital policy, would only be provided for a period of up to 2 hours, no more.

58. Instead of communicating with Mr. Emerson, Frisbie, again according to the medical records, relied upon his sister to get permission to increase medications, such as Ativan.

59. Without an interpreter, the medical records state that Mr. Emerson, somehow, "verbalized" his understanding of end of life care, including repositioning, PRN meds, oral care and more on August 26, 2019.

60. Mr. Emerson requested social workers to help his children with the bereavement process. Not surprisingly, no interpreter was provided when the social worker met with the children leaving Mr. Emerson out of this important family healing process.

61. Ultimately, Glenys passed away on August 28, 2019.

**MAY 2020**

62. On May 13, 2020, the Emersons were again at the Frisbie Emergency Department, this time for a situation involving Gabriella.

63. Aware of Frisbie's de fact policy to not provide live interpreters,  upon arrival, Mr. Emerson requested the use of VRI.  Frisbie personnel told him that they had no idea what VRI was.

64. Eventually, a doctor explained the system and it was wheeled into the room but did not work for some 20 minutes, at which time a second VRI system was used.  Both systems were covered in dust.

**AND SO IT CONTINUES**

65. Even as recently as March 2022, the Emersons found themselves again in the Emergency Department of the Defendant.

66. During this visit, again for Gabriella, Mr. Emerson begged that VRI be used, knowing that Frisbie had a de-facto policy against the use of live interpreters, but the VRI would freeze, it simply wouldn't work at times and the nurses themselves admitted to not knowing how the VRI system worked.

67. Perhaps the greatest demonstration of the Defendant's personnel's lack of training was that as the VRI froze, nurses just kept talking, leaving Mr. Emerson in the dark as to his daughter's condition and when it did work, nurses would stand in front of the screen blocking Mr. Emerson's equal access to communication.

## ALLEGATIONS RELEVANT TO ALL CAUSES OF ACTION

68. As described more fully above, Defendant's denial of effective communication during the medical treatment of the Emerson family caused the Plaintiffs significant pain, suffering and emotional distress.  Due to Defendant's refusal to provide effective communication, Christopher Emerson did not meaningfully understand critical information about diagnoses, prognoses, medication and/or treatment options regarding his wife and children.  The Emersons were forced to sign consent forms and undergo procedures and treatment without understanding the risks and benefits thereof.  The Emersons were also sent home from Frisbie without a complete or adequate understanding of the instructions for follow up care of the relevant patient or of their prognosis for future improvement, complications, or relapse thereby causing significant emotional harm, anxiety and confusion.

69. Of note, the assistive services offered "free of charge" by Frisbie, according to the "Communication Needs Determination Form" provided to patients list Deaf Talk and the use of a companion of family member as free services available to Deaf and Hard-of-Hearing patients but DOES NOT list an in person ASL interpreter as free service.  The form does allow for the request of a live interpreter but that service is not listed in the Assistive services/devices available "free of charge."

70. Upon information and belief, the set-up of this form is designed to dissuade deaf and hard-of-hearing individual from requesting live ASL and other interpreters by causing the belief they will need to be paid for by the patient or companion as they are not listed as "free of charge."

71. Upon information and belief, rather than leaving the VRI system on at all times so that Mr. Emerson had equal access, the machine was turned off and then rebooted to save on having to pay for the service, causing further incidents where no communication was available.

72. As described more fully above, Plaintiffs repeatedly put Defendant's staff on notice that communication was not effective by alerting them of the inadequacy of VRI systems and to their need for qualified ASL interpreters. Yet, despite such notice, Defendant failed and/or refused to provide qualified onsite ASL interpreters, failed and/or refused to ensure that VRI systems were appropriate for each of the Plaintiffs' circumstances, failed and/or refused to ensure that available VRI systems were properly functioning, failed and/or refused to ensure that the Defendant's agents were properly trained and qualified in the use of the VRI systems, and failed and/or refused to fix VRI systems that were not working properly.

73. Rather, Defendant knowingly limited Plaintiffs to the little communication the Plaintiffs could achieve through vague gestures, cryptic notes, and the few words Plaintiffs could understand through reading lips or by what could be understood by an 11 year old child.

74.  Given its 2010 settlement with the United States Department of Justice, Defendant is aware of its obligations under federal and state law to provide adequate and effective communication for the deaf and hearing and speech unintelligible individuals that visit its medical facilities as either patients or companions of patients.

75. Upon information and belief, Frisbie refuses to hire qualified on-site sign language interpreters as a matter of policy at its hospital and other facilities and insists upon communication through such inadequate means of communication as handwritten notes, gestures, lip reading, occasional operable VRI and the use of minor, hearing, children to act as interpreters.

76. Upon information and belief, the refusal to offer on-site sign language interpreter services to each of the individual Plaintiffs is the result of a policy or practice of Defendant to discourage the use of onsite interpreters without regard to whether VRI services or other methods of communication will provide effective communication, are available, or even in working conditions.

77. Reliance by Deaf and hearing impaired individuals upon family members to interpret medical communications for them is unwise and dangerous. Such family members are generally not trained to act as interpreters, particularly in medical and hospital settings. Family members often are untrained in accurately and precisely interpreting and conveying for and to the hearing-impaired individual the complete and accurate content of medical communications. In addition, family members are generally too personally and emotionally involved with the hearing-impaired patient to act impartially and with the emotional detachment that is necessary for qualified sign language interpreters, particularly in medical settings and communications.  Of course, when those family members are only 11 and 14 years old, all those problems are only compounded.

78. As a result of Defendant's failure to ensure effective communication with Plaintiffs, Plaintiffs received care and service that was objectively substandard and that is inferior to care provided to patients and patient family members who can hear.

79. Furthermore, despite Frisbie's knowledge and understanding of its legal obligation to provide adequate and effective communication to the Plaintiffs, and its knowledge and understanding that the failure to provide adequate and effective communication to Plaintiffs could and would result in denial of Plaintiffs' rights under law and in serious and material harm and injury to Plaintiffs, especially the minor Plaintiffs, Defendant knowingly, intentionally and maliciously failed and/or refused to provide adequate and effective communication to Plaintiffs in an intentional and/or deliberately indifferent violation of Plaintiff's rights.

80. It is reasonably foreseeable that each Plaintiff will continue to visit one or more of Defendant's facilities, either by choice or necessity, due to the ubiquity of Defendant's facilities and the proximity of those facilities to the Plaintiffs' homes or neighborhoods.

81. Based on the foregoing, on information and belief, the actions and omissions of Defendant resulting in harms to Plaintiffs were willful, malicious, intentional, recklessly indifferent and undertaken with an evil mind and motive and with disregard for and deliberate indifference to the legal rights of Plaintiffs under federal and state law and the substantial risk of serious and material harms to the Plaintiffs. Therefore, to the extent allowed by any applicable law, Defendant's actions would warrant, in addition to all other appropriate relief, the imposition of punitive, exemplary damages, or enhanced compensatory damages to punish the Defendant for its wrongful conduct and to deter other similarly situated persons or entities from similar future conduct.

## FEDERAL CLAIMS

## <u>COUNT I</u>

## <u>DEFENDANT VIOLATED TITLE III OF THE AMERICANS WITH DISABILITIES ACT</u>

82. Plaintiffs re-allege and incorporate by reference the allegations of facts contained in every preceding paragraph.

83. Plaintiff Christopher Emerson is substantially limited in the major life activity of hearing and his children are related to individuals so limited.  Accordingly, they are considered individuals with a disability as defined under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12102(2).

84. Defendant owns, leases, and/or operates a place of public accommodation as defined under Title III of the ADA, 42 U.S.C. § 12181(7)(F).  Title III of the ADA prohibits discrimination on the basis of disability "in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodations…"  42 U.S.C. § 12182(a).

85. Pursuant to Title III of the ADA and its implementing regulations, a public accommodation cannot deny participation or offer unequal or separate benefit to individuals with disabilities.  42 U.S.C. § 12182(b)(1)(A); 28 C.F.R. §§36.202.

86. Pursuant to Title III of the ADA and its implementing regulations, a public accommodation shall furnish appropriate auxiliary aids and services to ensure effective communication with individuals with disabilities.  42 U.S.C. § 12182(b)(2)(A)(iii); 28 C.F.R. § 36.303(b)(1).

87. Pursuant to Title III of the ADA and its implementing regulations, a public accommodation, in choosing the type of auxiliary aid or service to ensure effective communication, must consider the "method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place."  28 C.F.R. § 36.303(c)(1)(ii).

88. Pursuant to Title III of the ADA and its implementing regulations, in order to be effective, the type of auxiliary aid or service provided by the public accommodations "must be provided in accessible formats, in a timely manner, in such a way as to protect the privacy and independence of the individual with a disability."  28 C.F.R. § 36.303(c)(1)(ii).

89. Pursuant to Title III of the ADA and its implementing regulations, when a public accommodation provides VRI service, it must ensure that the service includes all the following criteria: "(1) [r]eal-time, full-motion video and audio over a dedicated high-speed, wide bandwidth video connection or wireless connection that delivers high-quality video images that do not produce lags, choppy, blurry, or grainy images, or irregular pauses in communication; (2)[a] sharply delineated image that is large enough to display the interpreter´s face, arms, hands, and fingers, and the participating individual´s face, arms, hands, and fingers, regardless of his orher body position; (3) [a] clear, audible transmission of voices; and (4) [a]dequate training to users of the technology and other involved individuals so that they may quickly and efficiently set up and operate the VRI." 28 C.F.R. § 36.303(f).

90. Defendant discriminated against the individual Plaintiffs on the basis of their disabilities by denying access to full and equal enjoyment of the goods, services, facilities, privileges, advantages, and/or accommodations of their place of public accommodation and equal opportunity to

participate in and benefit from Defendant's health care services in violation of 42 U.S.C. §§ 12181, et seq.

91.  Defendant discriminated against the individual Plaintiffs by failing to ensure effective communication through the provision of qualified in-person interpreters. On information and belief, the refusal to offer in-person interpreter services is as a result of a policy or practice of Defendant to discourage the use of in-person interpreters without regard to whether VRI services will provide effective communication and no matter the risk topatient care.

92.  As a proximate result of Defendant's discrimination, actions and inactions, Plaintiffs suffered harm as set out above.

## COUNT II

## DEFENDANT VIOLATED SECTION 504 OF THE REHABILITATION ACT

93. Plaintiffs re-allege and incorporate by reference the allegations of facts contained in every preceding paragraph.

94. Plaintiffs are substantially limited in the major life activity of hearing or are close relatives to those so limited.  Accordingly, they are individuals with a disability as defined under Section 504, as amended, 29 U.S.C. § 708(20)(B).

95. During all relevant times, Defendant was and continues to be a recipient of federal financial assistance, including, but not limited to, its acceptance of Medicare and Medicaid.

96. Pursuant to Section 504, "No otherwise qualified individual with a disability … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…"  29 U.S.C. § 794.

97. Defendant has discriminated and continues to discriminate against Plaintiffs solely on the basis of their disability by denying them meaningful access to the services, programs, and the benefits the Defendant offers to other individuals by refusing to provide auxiliary aids and services

necessary to ensure effective communication in violation of Section 504 of the Rehabilitation Act. 29 U.S.C. § 794.

98. Defendant discriminated against the individual Plaintiffs by failing to ensure effective communication through the provision of qualified in-person interpreters, the use of minor children as interpreters and in the other manners described more fully above and throughout this Complaint.

99. Defendant has discriminated and continues to discriminate against the Plaintiffs solely on the basis of their disability by denying them meaningful access to the services, programs, and benefits the Defendant offers to other individuals by refusing to provide auxiliary aids and services necessary to ensure effective communication in violation of Section 504 of the Rehabilitation Act. 29 U.S.C. § 794.

100.    As a result of the Defendant's failures, as described above and throughout this Complaint, the individual Plaintiffs have suffered and will continue to suffer mental anguish, fear, isolation, suffering, embarrassment, and humiliation.

101.    As proximate result of the Defendant's discrimination, actions and inactions, Plaintiffs suffered harm as set out above.

## COUNT III

### DEFENDANT VIOLATED THE ADA 42 USC § 12182(B)(1)(E) AND THE REHABILITATION ACT OF 1973 § 505(a)(2), 29 U.S.C.A. § 794(a)(2) BY ENGAGING IN ASSOCIATIONAL DISCRIMINATION AGAINST THE EMERSON CHILDREN

102.    Plaintiffs re-allege and incorporate by reference the allegations of facts contained in every preceding paragraph.

103.    Both the Rehabilitation Act and the ADA prohibit discrimination against those associated with someone with a qualifying disability.  42 U.S.C. § 12812 states; "It shall be discriminatory to exclude or otherwise deny equal goods, services, facilities, privileges, advantages, accommodations, or other opportunities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship of association."

104.     Christopher Emerson and Glenys Emerson are both qualified as disabled individuals under both Acts and their children, Gabriella and Christopher B., are persons aggrieved as defined by the Acts.

105.     By forcing untrained, unlicensed, emotionally upset minor children to act as interpreters, the Defendant violated both the ADA and the Rehabilitation act proximately causing harm to these plaintiffs.

106.     As a proximate result of Defendant's discrimination, actions and inactions, Plaintiffs suffered harm as set out above.

**STATE LAW CLAIM**

**COUNT IV**

**DEFENDANT VIOLATED NEW HAMPSHIRE HUMAND RIGHTS LAW, RSA 354-A**

107.     Plaintiffs re-allege and incorporate by reference the allegations of facts contained in every preceding paragraph.

108.     Plaintiffs are persons with a disability as defined by New Hampshire RSA 354-A.

109.     Defendant owns, leases, or operates a place of public accommodation as defined under New Hampshire RSA 354-A.

110.     New Hampshire RSA 354-A provides that "the opportunity for every individual to have equal access to place of public accommodation without discrimination because of age, sex, gender identity, race, creed, color, marital status, physical or mental disability or national origin is hereby recognized and declared to a be a civil right."

111.     Further, New Hampshire RSA 354-A:17 states, "It shall be unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation, because of … physical or mental disability…, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof; or, directly or indirectly, to publish, circulate, issue, display, post or mail any written or printed communication, notice or advertisement to the effect

that any of those accommodations, advantages, facilities and privileges of any such place shall be refused, withheld from or denied to any person on account of ... disability...; of that the patronage of custom thereat of any person belonging to or purporting to be of any particular ... disability ... is unwelcome, objectionable or acceptable, desired or solicited."

112.    Defendant discriminated against the Plaintiffs as set out above by denying them equal access to the services, programs, and benefits by refusing to provide auxiliary aids and services necessary to ensure effective communication in violation of New Hampshire RSA 354-A:17.  It is likely that the discrimination will recur.

113.    As a proximate result of Defendant's discrimination, actions and inactions, Plaintiffs suffered harm as set out above.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, the Plaintiffs respectfully pray that this Court grant the following relief against the Defendant:

A.  Enter a declaratory judgment, pursuant to Rule 57 of the Federal Rules of Civil Procedure, stating that the Defendant's practices, policies and procedures have subjected Plaintiffs to discrimination in violation of Title III of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973;

B.  Permanently enjoin Defendant from any practice, policy and/or procedure which will deny Plaintiffs equal access to, and benefit from, Defendant's services or which deny Plaintiffs effective communication with Defendant.  This includes entering a permanent injunction ordering Defendants:

   a.  To cease discrimination against Plaintiffs and other Deaf or Hard-of-Hearing patients and their families;

   b.  To promulgate and comply with policies and procedures to ensure that Defendants and their staffs do not discriminate against individuals whoare deaf and hard of hearing;

   c.  To promulgate and comply with procedures to ensure that Defendants will provide and pay for interpreter services when needed by individuals who are

deaf or hard of hearing in all services offered by Defendants;

    d. To promulgate and comply with procedures to ensure that Defendants will notify individuals who are deaf or hard of hearing of their right to effective communication. This notification will include posting explicit and clearly worded notices that state that the Defendants will provide sign language interpreters, TTYs and/or other communication services to ensure effective communication with deaf or hard of hearing persons;

C. Schedule a trial by jury;

D. Enter a judgment in favor of Plaintiffs awarding any and all relief available under law to the maximum extent allowed by common law, state and federal statutes, and the Constitutions of New Hampshire and the United States of America, including but not limited to the following:

    a. Compensatory damages;

    b. Enhanced Compensatory damages;

    c. Punitive damages;

    d. All damages available pursuant to NH RSA 151:30;

    e. Reasonable costs, interest and attorneys' fees; and,

E. Award any and all other relief that may be just, necessary and appropriate.

Respectfully submitted,

The Emerson Family

By their attorney,

RED SNEAKER LAW, PLLC.

Dated: July 20, 2022

By:*/s/ Kirk C. Simoneau (#19291)*
PO Box 1216
Amherst, NH 03031
603.336.2028
*kirk@redsneakerlaw.com*